Good morning, counsel. We hope everybody had a pleasant holiday. I'm going to call the cases as they appear on the calendar. If you wish to reserve some time, that's fine. Just keep track of your own time. There's a clock up there. And we start with Kuba v. 1A Agricultural Association. Good morning, David Blatt and Mr. Kuba. Can I begin? Yes. Okay, there are two analyses in this case. I'm sorry. These are always too low for me. The first is the state analysis. And as the Court knows, that if it's resolved under the state analysis, we need look no further. And I don't devote that much attention in my brief to the state analysis, only because the case, controlling case, is so directly on point. It's rare to find a case so on point. And the case is Carreras v. The City of Anaheim. And in that case, what we have is Anaheim Stadium with all its parking lots, people parking and wending their way to Anaheim Stadium. And this is what the Court says. The test they apply, and I'm reading from page 1045, the test under California law is whether the communicative activity is basically incompatible with normal activity of a particular place at a particular time. And this is what they say. And they could be talking about our case, but they're talking about theirs. The exterior walkways and parking areas of Anaheim Stadium, that's what they're talking about, are much like the parking lot at Soledad Prison. At all three locations, the public is free to come and go just as we have. At the Stadium and Convention Center, the public travels over the parking lot and walkways to attend sporting events or exhibitions. That's exactly what we have. People park in the parking lots, and they wend their way over the walkways and through the lots to the Cal Palace. The purposes of the three locations are very similar. The facilitation of parking and a free flow of pedestrian and vehicular traffic. That's exactly what we have at the Cal Palace. That's the purpose of the parking lots. The Court concludes that solicitation, and we'd have less than solicitation, by appellant is not incompatible with the intended uses of either the exterior areas of the Stadium, the exterior walkways of the Convention Center. And we're claiming what goes on in those exterior areas. In this case, it's exactly what goes on in Carreras. In addition, what goes on is you have commercial vendors handing out leaflets on the walkway. You have a man on stilts. You have basically this one incident with regard to the radio station. Is there anything else? There's nothing on the record, correct. I see. And that's kind of vague. What leaflets were they handing out? We don't really know what they were doing. Well, there's a radio station that rents a commercial spot, and for some reason, I don't know what it was on that particular day, one of the people from the radio station, and this is unusual actually, he walked over to the walkway, started handing out flyers. I assume it was promoting the radio station. I'm not sure what it was doing. The main point is what he was doing was compatible with the area. He was talking to people, handing out leaflets. What is it that Mr. Kuba wants to do? That's exactly what he wants to do. He wants to do the same thing? He wants to walk around, even in that walkway. If he were to stand in that exact spot where the radio person would be, he'd be very happy. He'd stand there, he'd hand out literature. If people wanted to talk with him, they would talk with him. That's all he wants to do. He's not soliciting. He's just promoting his free speech ideas. So what exactly are you looking for in this lawsuit? Are you looking for an invalidation of the policy in whole or in part or a revision in what direction or just some accommodation of Mr. Kuba, for example, to allow him to be in the walkway? What ultimate order are you looking for? This is the order. First of all, we believe that the little boxes 200 feet from the entrance are unconstitutional. There's just no reason to put him there. What we're looking for, he would like unfettered access. He would like the right to walk around all the parking lots, the walkway, and even the apron area, as well as the fire lane. So right now we have people walking there. We have a cowboy on stilts walking in the fire lane. We have cars dropping people off in the fire lane. I'm not clear why they allow that. If the court were to look for reasonable restrictions, what I would like is the court to say, no, this is unconstitutional. You have to have reasonable restrictions if you're going to do these at all. And this is my idea of reasonable restrictions. First of all, there's no reason to put any restrictions in the parking lots and in the walkway. We have 10,000 people going to and fro, adding Mr. Kuba or a handful of demonstrators would not change that. What they could do, and I believe this is reasonable, the lower court was concerned that there would be hundreds of people in the lot. And as a practical matter, that's not what happens. It's just a handful of demonstrators. If the Cal Palace were to say, well, we're not going to allow more than 20 people to do this. After that, they're going to have to be in these zones. That would be reasonable because, you know, up to a point, when you reach a certain point, it creates a problem. There's 10,000 people. One or two, five, ten are not going to create a problem. But they have numerous limitations. Right. And the court in Heffron specifically, I'm sorry, Hoffman specifically addressed that. That was where there was a railway station. There were 15 people inside the railway station. And the court in Hoffman said reasonable and objective limitations can be placed on the number of persons who can be present for First Amendment activities. That's a reasonable time, place, and manner restriction. The second restriction I think is reasonable. We have this apron in front of the Cal Palace. And people are standing there waiting for rides, smoking, just buying tickets. And it's generally not too congested. What happens right before and after a show is that all these people converge and all these people are leaving. It gets very congested. And I would agree it would be reasonable not to allow a demonstrator there, say, 15 minutes before a show, 15 minutes after a show. Those are, to me, reasonable restrictions. And given the facts, what they've shown, what we have, we have 10,000 people going back and forth on a given day. We have already a man on stilts, as I mentioned. And this is crucial. I guess I'll go right to the federal analysis. Let me just, before you do, the district court focused on the difference between persons who were paying a fee to use the facility and those who were not. And I think she was concerned that what your client wants is to be allowed to do whatever everybody else does if they rent the place. And is that what you claim he's entitled to do? Well, he's not looking to rent a particular spot. No, no. I'm saying that I think the district court focused on the fact that without renting a spot or without ever having tried to rent a spot, he compares himself and what he is not permitted to do with those who are paying for a spot. Is that factually accurate, that that's what he's seeking? Right. He believes, and the courts have held this, that he does not have to pay to exercise his First Amendment rights if there was a problem. No, no. Can he do anything on the exterior of that premise that anybody is doing who's paying for it? No, no. He cannot. Well, there's a question of whether he could solicit. He could probably not solicit under Heffron, but he's not looking to solicit. He couldn't do that. He's looking to hand out things. Correct. And the court makes a distinction between soliciting and handing out things. Yes. And he's seeking to promote his ideas. Correct. And the guy out there on the stilts, do we know who hired him? We assume he's an ambient act, part of the rodeo show. And we assume that the rodeo show is paying a fee to use the place. Correct. And the radio station, was it paying any fee to use the place? Yes. So the district court then is correct in her observation that what the plaintiff is asking is that he be given the same access to the facilities as those who are either employed by the defendant or who are making payments of some kind to the defendant. Is that true? That's always true when you have First Amendment activity intermingled with commercial activity. Not necessarily. If I can answer the court's question. Let's go back to the career. Let me go back. My question is, is that true? Is that what he is seeking? He is seeking equal access except for the fact that he doesn't want a specific spot to rent out. But apart from that, he's seeking. What's everything else? Well, everything else means he wants the right to express his activities. Fine. But what I'm groping for is the statement that the district court made is true. It's true that. Also true, as I understand the record, that if he wanted to pay, they wouldn't necessarily let him pay? That's true. They said that. I cited that in my brief. I can't access that quickly. But, you know, I don't the reason I didn't focus on that that much is because you have a commercial activity. And the problem is you also have First Amendment activity going on, which doesn't interfere with that commercial activity. This is the key. If his activities interfered with the commercial activity, if he took away money from the Cal Palace, that would be a different story. The problem is, of course, what's interesting about this case is that's exactly what he wants to do because his message is boycott the rodeo. Well, right, but he's trying to get – that's a little different. But it's an interesting case. Right. That's a little different than taking out – taking up commercial space and directly affecting their profits. In fact, I mean, if the Cal Palace argues that, well, because of him there's one less car space and wanted to charge him seven bucks for the car space, there's a case law that says, yes, that's okay. So he has no problem with that. I think there's no dispute in this case about whether this is public property. There really isn't a dispute of the usual kind about what kind of a form it is, partly because of the California law issue. And you're talking about the difference between California and federal law, but other than not having to get into the initial form, tripartite form discussion, what is the difference? Excuse me. Isn't a time, place, and manner rule applicable under both analyses? It's roughly the same. The analysis is framed a little differently. They say, is the activity basically compatible with the uses? Well, that's the going in theory, but I thought in California law you still get to a time, place, and manner analysis. I believe – What you don't get to is the limited form, non-public form, all that stuff. Right. I haven't focused on that issue. That makes sense. I mean, if it's not incompatible, what you can do then is make restrictions dealing with that incompatibility. Which is basically what you're saying, essentially. Right. But let me – I'd like to move on to the federal analysis. That's what I'm asking you. Why is it different? What's different about it? Well, they put – It's the same, isn't it, under Los Angeles Alliance? Right. It's roughly the same. It is. Although the courts do say that under California it's a more liberal standard. I cited that in my case. As Judge Grison was saying. But once you get to time, place, and manners, it's basically the same, isn't it? Narrow neutrality, narrow – Right. Right. I don't disagree with that. I don't disagree with that. But let's look at the heart of the case. And this is really the heart. The Cal Palace – and this is saying that there is congestion and a safety problem. That's what they're saying. And this is what they say in their brief. The evidence shows that the traffic at the Cal Palace is congested and that allowing unbridled and unrestricted access by demonstrators in a parking area could impact and increase congestion and reduce traffic safety. These conclusions – and this is what they base them on. This is important. Are based on the observations of Mr. Weger, who's the executive director, and upon the association's own findings as well as a past experiment they did. That's the evidence they have that there's congestion. It's their opinion that there's congestion. There's no objective evidence. What we have on the other side – and I'll repeat it because it's so important. We have 10,000 people going to and forth. What we have is a cowboy on stilts in the walkway on the fire lane. They say, on the one hand, the fire lane has to be open according to law. On the other hand, they let buses, taxis, and cars drop people off on the fire lane. They let a cowboy on stilts in a fire lane. Now, if there's a fire or an emergency – If there's anything – it's also true there's the Carreras case and then there is the actual practice of the sports arenas in the area, which I gather do allow, like the Oakland College team and so on, pretty much allow what you're asking for. Is there anything that's different about or claimed to be different about the Cow Palace from those kinds of venues? Well, I don't think there is. I believe they're arguing – they're going to focus on the commercial. They're just going to say there's all this commercial stuff. Outside. But I have a few responses. First of all, that's a small part of their income. They only have a handful of commercial vendors at any given time. They make their money by what's going on inside the stadium. Secondly, I might compare it – and what we have at Anaheim Stadium and any stadium, we have vendors in the parking lot. We have people selling programs in the parking lot, people selling food in the parking lot. So at Anaheim Stadium, they can't come and say, well, because we have these commercial vendors here, we're not going to allow a person to do his free speech activities. You can't say, well – Isn't the larger point that most of the area that you want to distribute, there isn't commercial activity? There is. Not commercial activity. Isn't the commercial activity basically around the doorway? Correct. It's in the preferred parking lot, basically in the handicapped spaces. And, again, it's just – that's only a small part of their – of the whole revenue. Very small. Sometimes they have one or two vendors there. But in any event, there is room – but even if they were to leave all the commercial activity where it was, you – your client is still being excluded from a much broader area than that. Correct. A perfect example is the walkway. We have a walkway going from the upper lot straight to the Cal Palace, which there's no evidence of congestion. There's just people walking there. There's absolutely no reason that my client can't stand in that walkway. And what they've done is they've stuck him in this little box. What happens is you have the upper lot and you have these stairs that go down, and then you have the walkway. He's actually under the stairs in this little box where people come down. They don't even notice he's there until they're there, and then they're just going forward. They've done that when there's absolutely no reason to allow him in the walkway, in the upper lot. These are big lots. These are – there's 4,000 spaces at the Cal Palace. There's a lot of room. The lower lot is about 150 by 400 feet in size. Could I clarify one thing about your argument? In the policy statement that was at issue here, it doesn't identify the particular free zones. And I really wasn't certain whether your challenge is a facial challenge to this policy, it's outright unconstitutional, or whether it's as applied in this particular context. Well, it's applied in this context. I mean, zones are allowed in other contexts. I think they've been used in abortion cases, in the Bay Area, in the Peace Navy case. There was a discussion of whether you could have, you know, these zones, buffer zones. So on their face they're not unconstitutional. In this context they're unconstitutional. Because the way in which they've applied this policy is what you're after. Right. I mean, if they're going to have restrictions, the type of restrictions I suggested, they have to justify why they're not allowing my client on that walkway. They have to justify why they're not allowing him in these giant parking lots. They have to justify that. They haven't done it. What's interesting, this is an important point. One of the things that's troubling me is that you – Excuse me. I will want to reserve a few minutes for rebuttal. I see I have three and a half minutes now. Answer Judge Berzon's next question. I didn't even make it. I don't know what it is. Okay. Thanks. I'm sorry. I didn't know the policy. I have one last question for you before you sit down. Do you contend that this policy is content neutral? The policy is – on its face, it's content neutral. The fact, as the judge said, that they will not rent to him, but they will rent to commercial vendors because of their message, makes the application not content neutral. But, again, we're not challenging that at this point, because we think that these zones are, in this particular case, unconstitutional. We're looking to complete eradication of the zones and access to those areas which don't affect the congestion and the safety. But not necessarily access to the areas that are now being used commercially? Correct. Those are parking spaces. Right. We have no problem. We don't want to – Mr. Kubit, the last thing he wants to do is interfere with business. That's not his intent. His intent is to spread his message. He wants all the people walking to and from – So the argument of the district court or the holding of the district court, which is that you were trying to get for free what these other people are paying for, is just not true because you're not trying to get that. Correct. We're just trying to get access that's compatible with the uses. Okay. Thank you. Good morning. May it please the Court. Charles Goetz, Deputy Attorney General. I want to briefly touch on three issues, the propriety of summary judgment very briefly, the nature of the forum, which I do believe is somewhat in dispute, and thirdly, of course, the reasonableness of the guidelines and restrictions of the forum. Very quickly on the propriety of summary judgment, we don't believe material facts are in dispute. However, in all candor, the briefs filed by the appellant do raise certain factual issues which, if this Court finds constitute material facts properly, would then be remanded back to the district court since this is on a Rule 56 summary judgment motion. On the nature of the forum, which really is an important issue. Such as what? I'm sorry, Your Honor. Such as what? Well, you just heard, for example, a comment by Mr. Blatt that the content neutral, is it really content neutral, number one. Secondly, whether – Well, there was something in the record in which somebody said that if they wanted to rent the space, they wouldn't rent it to them because it was not commercially – because they were opposing the commercial use and therefore it wouldn't be useful to do that. Well, I think that might be perhaps an overly generous reading of that record because I believe – Read it. That's what he said. I understand. I have too. First of all, he's never tried, so it's speculative as to what would happen. Secondly, as with the Heffron case and the facts, the Cal Palace has a policy of related, subject-related activities. Now, let's face it, anti-rodeo is related to rodeo, so I don't think that's the bar. The third item, though, is one of prior rentals and space and seniority rights, if you will, being given to those who've rented before. There may just not be room, but it's never been tried, so we don't know. And that, I think, is a fair reading of the record as to what would happen. We don't know. Mr. Kuba hasn't tried, apparently has no interest in trying. The nature of the forum, though, I think, is one of those issues where there is a disagreement between the parties. Were there cross motions for summary judgment? Yes, there were. There were. And then – We could, for example – we don't have to treat them both the same. That's correct. So, essentially, if we thought there was a record problem, we could reverse one but not the other. Okay. You mentioned earlier that there was no dispute as to the public forum, Justice, and I believe that there's no dispute per se, but there is a sliding scale under state law, and this is not, and the Cow Palace has never stated otherwise, a traditional public forum such as streets and sidewalks. Now, what's interesting is that Judge Wilkins and the district court applied the test of a time-place manner as if this were a traditional public forum. That was an error. We meet that higher standard. But what we're suggesting and arguing is that under state law, which you certainly apply first, you look at a sliding scale of public fora with streets and sidewalk on one end and the interior of this courtroom, for example, on the other side of public-owned property and determine, first of all, where is this public fora and that sliding scale under state law? And secondly, is the activity incompatible with the activity of that public fora? What about the Carreras case? Why isn't that pretty much binding here? Has the law moved on in some fashion? The Carreras case is not binding here for a couple of reasons. Number one is the Supreme Court has very clearly enunciated in Heffron and other cases. Each of these matters has to be looked at on the unique circumstances and facts of the record. How are the circumstances different? Well, for one, there's no complete ban on solicitation or leafleting as there was in Carreras. Mr. Kuba is free to do what he wishes to do without restriction at all along Geneva Avenue, but within the property in three currently designated three zones which he refuses to abide by. That includes handing out leaflets and whatever he wishes to do. Secondly, Carreras, I cannot find in your opinion any discussion as to circulation issues or safety issues which are either raised or decided or central to the holding. Other issues are raised and rejected, I think quite rightfully, as not being a reason for a significant governmental interest on that absolute ban of any First Amendment activity. Now, those are two very, very different situations than faced here. Here, as in Heffron, we have a much, I think, closer match with the situation. The entire Cow Palace is commercial. That includes the parking lot, and I mildly disagree with your characterization that, well, the commercial areas are in one part of the exterior and the noncommercial are in others. There's no such distinction. Secondly, there are no walkways except for one that goes up from the upper lot. Well, why isn't there? Well, the parking lot is commercial in the sense that it's a commercial parking lot, but in terms of other activity other than parking, for the most part, it's not there, right? That's the only activity, Justice, is parking and walking from the parking lot, which is done in a chaotic manner, toward the front doors by patrons. So you have a traffic circulation and safety issue if somebody is intercepting or passing out leaflets. Well, nobody is. It's not like solicitation. They're not trying to solicit money and delay having people reach into their pockets to get out money. He wants to hand out his little piece of paper. Your Honor, you would. You walk down the street and somebody hands you the paper. You can take it or not take it. Correct. You can move it later when you get to your seat and you want to sit down and get it. First of all, I absolutely agree, but first of all, the Supreme Court did not decide Heffron on solicitation only. They included distributing, and they mentioned that that does result, even if it's incremental, in a delay. But more importantly, this is certainly not per se in the record, but it's common sense. When you receive a leaflet, and I've observed Mr. Kuba and others passing out leaflets within the zone, you take the leaflet, you look at the leaflet, you almost stop to see what it is, you either give it back or you take it with you or you discard it later on. There is a difference between what the guidelines also allow and also was allowed in Heffron of one-on-one voluntary discussion with no exchange of leaflets or solicitation. Much more likely to interfere with people's proceeding if they're going to stop and have a conversation than if they're going to take a piece of paper. But interestingly, Justice, it hasn't. That has been the rule since the beginning of the guidelines. Secondly, in the – we did – Have you tried allowing individual single people to leaflet in the walkway and find out if there's a problem? Well, yes, they are allowed to leaflet in the walkway right now. The difference is Mr. Blatt has touched on this. There is a zone, the one walkway that goes from the upper lot to the front door. It's a straight shot. A hundred percent of those people must pass by this – it isn't a small box – by this area and are capable of being leafleted if they wish to take one. How big is the box? Oh, you know, there's a diagram at ER 16 which is in scale, but it's big enough for 10, 12, 15 people. It's not small. It's right along the pathway? Yes, sir. Everybody walks right by it. You cannot avoid walking by it. Mr. Kuba – in fact, that box has been moved, and that's in the record, up – halfway up that walkway into a space in the preferred lot at the request of not Mr. Kuba, but other similar activists to try to increase the visibility. The only walkway, therefore, has reasonable access to it. Now, the south parking lot, they did an experiment where they had a line of protesters. They didn't tell them where to stand. They just allowed them to stand where they wanted. They did leafleting just to see what happened, and it did result in delays and congestion, and it did result in problems, and that is the testimony refuted of Mr. Wager. So this is not something that is speculative or just made up or a concern out of thin air. There is legitimate concerns that circulation and traffic would be impeded. Secondly, in terms of the forum, it is a commercial forum. To allow Mr. Kuba free access to space that others pay for similar, if not identical, activities regardless of content causes problems. This is really very interesting because it is – we know that it's unconstitutional to distinguish between commercial and noncommercial speech. For example, the newspaper box cases. Yes. But your position is either that it's okay if you're discriminating in favor of commercial speech or that it's okay if you're discriminating because the commercial speakers are paying. So which one is it? Well, Your Honor, the guidelines currently allow free speech for noncommercial purposes only, paid speech for both. In other words, we don't distinguish in the paid speech part. You can buy a spot, and it isn't just restricted to commercial. Well, there's no good conflict on the record on that question, but at least a conflict. But I tend to agree with you. I think that perhaps the only weakness I can see in the guidelines is that maybe we cannot prevent free commercial access within the guidelines, and that, of course, raises a heffron problem, that Mr. Cuba is not the only person who benefits from a change in the regulations. For example, if we have a Dodge dealer, and this is a quite accurate representation, who rents the preferred lot to show his new trucks to people who go into the Cow Palace, why not have a Ford person show up for free and pass out leaflets under the guise of the First Amendment and thus undercut the commercial viability? That would become almost then subject matter regulation, which is a very, very high standard. That's one of the concerns I think the Cow Palace had in saying it is incompatible to allow anyone free access to space that is rented or rentable to somebody else. It undercuts the entire purpose of having rented space, and the rented space is indistinguishable inside or outside the facility. Rented space is rented space. The entire parking lot on some occasions, not for the rodeo, is rented for religious or computer shows or other purposes where they actually do displays outside as well on occasion. So I reject, with all due respect, any kind of a differential between one part of the external area rented and another. All are capable of and are rented on different occasions. And it's a very, very different animal than apparently the Anaheim factual situation. But isn't it true that somebody who is using the Cow Palace for a commercial purpose is allowed more latitude in the exterior than somebody who isn't renting space on the inside? Actually, Justice, no, and I'll tell you why. You notice that in mentioning the radio station, the Stiltman, and the Dodge Place, they are not roaming all over the area because the same traffic and circulation problems apply. They are restricted to one spot. Apparently the radio station was wandering around the area. No, no, ma'am. There was a trailer parked in a couple of the preferred lot spots, and then right next to that trailer near the walkway adjacent to it, not in it, was somebody handing out apparently leaflets promoting the radio station. So there's a conflict in the record on that, too, because there are certainly some statements in the record that he was walking in the walkway. I believe there are statements probably from Mr. Kubis' side that occurred. That's correct, and there may be a conflict in that sense. But the point is they're under the control of the Cow Palace, unlike people who are there for their own purposes and are subject, therefore, to removal or to discipline if there's any kind of a problem. The station, and I wasn't clear about this, were they paying or were they actually there for free because they were sponsoring or somehow providing a service? I believe you'd call it an in-kind contribution. They were basically trading what would otherwise be a rental fee for free air time. So certainly it was not free. It was not giving them. The Cow Palace didn't give them anything for free. They had a commercial message which would cost the Cow Palace money. It was a swap of air time for space, which suits the Cow Palace's purposes and is consistent with the purpose of the Cow Palace, which is a commercial venture, not a debating area of the state. The radio was providing advertising time or they were just covering the radio, the rodeo? It was actually providing ad space for the rodeo. It was also covering the rodeo as part of its program contents. It was doing both, and that's the covering the program. A country western show radio station, right? I believe it was, taking a wild guess. I don't think it was a heavy metal radio station. And so just like the Dodge dealer, there's a relationship because many of the people who go to the Cow Palace and go to rodeos are pickup truck people and want to see the newest vehicles. But it raises the issue of you can see the slippery slope if Mr. Kubo requests, which sounds very reasonable. Let me just wander in the walkways, of which, of course, there's only one, and pass out these materials must be open to all regardless of content, which is the position we take would happen. And that's exactly what the Supreme Court said in Heffron would happen. And it isn't required under Ward against Rock against Racism for narrowly tailored to mean the most narrow or perhaps what a court thinks is the appropriate narrow standard. The issue here really isn't the restrictions. It's whether or not having these free expression zones is constitutionally permissible. And we believe that Heffron says it is. Could you go over these zones as they now exist? My understanding is that they are not, well, I guess my question is, are they set up such that as a practical matter it is possible to reach whoever is coming into them? Two of the zones reach 100% of the target audience. The third one has always been problematic. The zone near Geneva Avenue. Everyone who parks for free on public streets must walk through this gate off Geneva Avenue. And there's a zone right there. Of course, there's also the public sidewalk which reaches 100% of all people entering the Cow Palace. Not with leafleting, which, of course, Mr. Akuba insists on doing, but with signs or anything else. Excuse me, but leafleting has somewhat of a favor position under constitutional law. Yes, it does. He insists on doing it as really somewhat to undermine the constitutional principles here. Your Honor, with all due respect, you're absolutely correct, but this Court and the Supreme Court has repeatedly said that any particular form of communication is not protected in the balancing that occurs. As long as alternative, for example, channels are available, as you said, in Peace Navy, then it is constitutional. The right to leaflet is important, but the insistence that leafleting is the only thing that must be allowed is not constitutionally protected per se. First Amendment activity is. The second zone, which is the one underneath the staircase, reaches 100% of the people coming off of the upper parking lot and going to the front doors. The south zone, the zone that is along the south parking lot, which takes up one parking space, is a problem, and it's been moved trying to reach people better, and that's because of the chaotic nature of the parking lot there. It's only slightly shown on ER 16, the chart, because that cuts off most of the area. But here you have thousands of cars, hundreds of people, right before a performance and afterwards streaming into the Cow Palace and then coming back out after a performance in a chaotic manner, and the concern of the Cow Palace is it's bad enough as it is. There are no walkways in that south zone until you get to the very front of the Cow Palace, in which case there's a fire lane and some designated cross-edge walkways there. So to place a zone, and we have tried to move them even to the side of the building, which protesters have not found to be acceptable, to reach those people is almost impossible. So the best we can offer and the guidelines allow is for Mr. Cuba to wander the parking lot and speak to people. If that becomes a problem, then obviously that will have to be addressed, but we don't have the evidence that that has ever been or is a problem right now. Do you have any evidence that wandering the parking lot and speaking to people is more disruptive than walking the parking lot and handing them pieces of paper? Yes, we do, because of the experiment we did. Yes, absolutely. That was an experiment that involved a single person? No, that was an experiment involving a whole line of people because a single person cannot reach 10,000 people any more than Mr. Cuba could. Mr. Cuba can only reach a handful, no matter what we allow. And that was an experiment that dealt with leafleting? Yes, ma'am. Leafleting. Not solicitation, only because that group didn't wish to do that, but it did deal with leafleting, signs, one-on-one discussion, and the results speak for themselves. We believe that the reason— Well, say that again. The results speak for themselves. How did they measure the results? They measured the results based upon the observation and the comments of patrons, and it wasn't the complaint of patrons about the content. It was rather, you know, I had to run a gauntlet to get in here. I couldn't get by. There were people passing me things, and I had to look at it, those sort of things. Also, the observation of the staff that was there on site, and the flow of people and the impedance of people as they tried to get through this area, with people passing out leaflets. Of course, when you have somebody passing out a leaflet who is free to roam, they're going to walk alongside and hold that leaflet. How many demonstrators were involved in that test? I believe— And were they sort of congregated down there in the area along by the driveway? They were actually along one of the lanes so they could reach people as they wandered in. They were not restricted to any, you know, one every five feet. But I don't believe they were congregated per se, and I believe a number of— They weren't allowed just to roam all over the place. They were allowed to, but we requested that they try to stay for safety reasons within that line so that people who had to go to the front doors, which is everyone from the south lot, had to go by them. We said rather than just kind of wander willy-nilly through the parking lot, let's try to have a line where you can stand and reach people on each side as they come by you because they'll have to pass by you. And I believe there were about eight to ten, but I don't have— It isn't in the record. I don't have an exact number for you. And it did result in problems and did result in increased congestion. And, of course, that's an active parking lot with driving and children, and it just is not a good idea to have distractions. And that's why we believe the regulations, which do not prohibit free speech activities, do not prohibit leafleting, offer alternative communication for 100 percent of those attending an event along Geneva Avenue, as the district court found. Because for the most part prohibit leafleting, as you said before, because at least in two of the three zones you really can't reach anybody with leaflets. One of the three you can't reach 100 percent. Two of the three you do. That doesn't mean they take them. With leaflets? Yes. Two of the three you can reach 100 percent of the people. 100 percent of the people who happen to go right by the door. All of them must go right by each zone. That's the point. The pedestrian walkway from Geneva, that zone is located where people must pass it. Now, whether they go over and get a leaflet is up to them. We can't force them to. The walkway from the upper lot, literally you are no more than four feet, five feet from the zone at the widest of that walkway. It's impossible not to see people and not to accept a leaflet if you wish it. And I see people getting leaflets there rather routinely. In fact, we had to put a trash can right next to it because a lot of people want to discard the leaflet and we don't want them to litter. And then not only do they discard it, but the protest is recycled, which we are certainly in favor of. I'm a little confused about when you use 100 percent of the people, you're using 100 percent of the people from a certain parking area. Correct. Now, what about 100 percent of the people who find their way into the building? The only way you could do that would be to have a phalanx of protesters along the front doors of the building. And even that won't work because the side doors can be open sometimes of the lobby. So you'd have to have people around the side as well. So each time you use the number 100 percent, you're talking about 100 percent of somebody coming from some fraction. That's absolutely correct, and I didn't mean to imply otherwise. It's 100 percent of the upper lot, 100 percent of the pedestrian traffic. That may not be anywhere near 100 percent of those patrons. And even if you had a person in each of the three places simultaneously, you wouldn't necessarily reach 100 percent. With this size crowd, Justice, how can one or four individuals passing out leaflets wandering all over that parking lot reach 100 percent? We're only talking about locations. Yes, I understand. And you mentioned three. And you're absolutely correct. If you had three locations fully staffed, you still wouldn't reach 100 percent. No, Justice. There's no way you could. Okay. Thank you very much. Thank you. We appreciate your argument. Mr. Latty, you have a few minutes left. Okay. Let me make one thing clear what's going on here. Cal Palace does not like my client's message. My client is opposed to the rodeo. He wants to spread that message. They don't like it. Everything else is just a justification for suppressing it as much as they think they can get away with. Now, before I talk to the placement of the boxes, and I don't want to spend much time there because we're claiming they're unconstitutional in the first place. They have not explained why my client and a few other demonstrators with a limited number can walk around the lots and walkways. They haven't explained it. There's no reason. They do this experiment. Of course, the court can put its weight on that. We have someone from the Cal Palace saying, oh, we did this experiment, and we believe that it's congestion. That's totally meaningless. What we have, and if the courts have it, if the honors have it, on page ER-16, we have a map of the Cal Palace, and it shows where the boxes are, and it only shows one of the parking lots. This is ER-16. Is this section A parking lot? That's the preferred lot is the one that's visible. And we see a lot, we see a number three there. That's one of the lots. It's actually been moved up towards the bottom, towards south. And people from section A meander towards the entrance. A few might pass three and might stop. Section two we already talked about. It's right under the stairs. People can't see it. Section one, no one can see that, only people who are coming from off the premises. So we have two thousand. Is that a driveway entrance? That I believe is a walkway entrance. The driveway is just below that. So, again, not only do these reach virtually no one, if these boxes were sufficient we wouldn't be here. My client would say, yeah, I'm reaching plenty of people. They're not sufficient at all. They're tucked away in these little corners. Did you just say that box three had been moved further up? No, it's further, it's on the other side of the walkway about halfway through. That's where it is. But, again, I don't want to focus on these. There's no reason my client can't be in any of these areas. Are there other parking lots other than what's shown on the screen? Yes, to the right where it says section A. That parking lot has approximately, I believe, 1,400 spaces. The preferred lot has about 400 spaces. Section A has about 1,400. Then the upper lot, which we can't see, it would be on the bottom of the page, has also about 1,700 parking spaces. These are gigantic areas. People are all over the place. Again, 10,000 of them. And they can only get into the town palace through the main entrance. Correct. But, again, you know, if these were adequate we wouldn't be here. They're simply not adequate. There's no excuse for allowing my client not to be in the walkway areas in the parking lot. They haven't given one. You know, congestion was addressed in the Anaheim Stadium case in one of the footnotes I pointed out in my That's a representation that with regard to the walkway they can be reached from the box two. Again, first of all, they're coming from the upper lot. And as I mentioned before, the zone is right underneath the stairs. And they're walking down the stairs, they're looking forward, there's all this excitement. Then right over there there's this little box with people saying, oh, do you want a leaflet? It's hardly adequate. There's no reason my client can't roam or stand on the top of the stairs. Why would that not be allowed? Then the people coming there would see him. They'd have a chance to know that he's there. They can make a decision as to whether they want to take a leaflet or not. It's not forced upon them. We're out of time. Okay. Thank you. Thank you. Matter will stand submitted. Thank you. Thank you. Next case is United States v. Hankins. It's Mr. Carr, I believe, represents Mr. Hankins. May it please the Court. Jason Carr on behalf of Appellant Hankins. When the government seeks to introduce extrinsic act evidence, the crucial determination the district court must make is that
judges: Leavy, Paez, Berzon